UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOE HAND PROMOTIONS, INC., § <br> Plaintiff, § <br> § <br> vs. § <br> § <br> MICHAEL P. MCGILL, KATHY S. § <br> MCGILL, Individually, and as § <br> officers, directors, shareholders, and/or § <br> principals of THE PLATE SPORTS § <br> BAR & GRILL, LLC § <br> d/b/a/ Plate Sports Bar & Grill § <br> Defendants. § | C.A. No. : 1:11-CV-04385 <br><br><br> PLAINTIFF'S AFFIDAVIT |

**PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT**

STATE OF PENNSYLVANIA )
) ss:
COUNTY OF BUCKS )

I, JOE HAND, JR., being duly sworn, depose and state the following:

1. I am the President of Plaintiff, JOE HAND PROMOTIONS, INC., and as such I am fully familiar with the facts, circumstances and proceedings of the instant matter.

2. I make this affidavit in support of Plaintiff's request to recover statutory damages, including attorneys' fees, investigative costs, and interest in the within request for judgment by default.

3. Our company, JOE HAND PROMOTIONS, INC., is a closed circuit distributor of sports and entertainment programming. Our company purchased and retained the commercial exhibition rights to the "UFC 109: Relentless" broadcast, including all undercard bouts and the main prizefight, broadcasted on February 6, 2010, (hereinafter the "Event"). Our company

1

thereafter marketed the sub-licensing (commercial exhibition) rights for the Event to our company's commercial customers (i.e., casinos, racetracks, bars, restaurants, and nightclubs). A true and correct copy of the Agreement is attached to Plaintiff's Motion for Default as Exhibit "A-1".

4. Simultaneously with the advent of pay-per-view programming, we began to experience serious erosion in the sales of our own proprietary programming to our commercial customers throughout the United States of America. To protect ourselves, we endeavored to find out what was the basis for the erosion and determined from our customers that the cause of the erosion of our customer base was the rampant piracy of our broadcasts by unauthorized and unlicensed establishments (signal pirates).

5. In response, we embarked upon a nationwide program to police our signals for the purpose of identifying and prosecuting commercial establishments which pirate our programming (including the "UFC 109: Relentless" event, the subject program involved in this lawsuit).

6. Specifically, JOE HAND PROMOTIONS, INC. retained, at considerable expense, auditors and law enforcement personnel to detect and identify signal pirates. To ensure that only illegal locations were visited by the auditors, our company compiled our confidential list of customers (authorized and legal locations) who paid the required license fee to broadcast the Event, and this list was distributed to participating auditing and law enforcement agencies in strict confidence.

7. Domestic commercial establishments, which contract with us, were required to pay my company a commercial sublicense fee to broadcast the Event. This sublicense fee for the Event was based on the capacity of the establishment and varies for each event. For example, for

this particular event, if a commercial establishment had a maximum fire code occupancy of 100 persons, such as in the instant case, the commercial sublicense fee would have been $1,100. A true and correct copy of the Rate Card is attached hereto as Exhibit "A-2."

8. The Event contained several televised under-card bouts and color commentary, along with the main event prizefight between Brian Stann and Phil Davis. As set forth within the sworn Affidavit of Jim Hollenbeck, it was the undercard fight between Demian Maia and Dan Miller and the main prizefight between Brian Stann and Phil Davis, which Mr. Hollenbeck observed as being *unlawfully* exhibited by Defendants' establishment doing business as "Plate Sports Bar & Grill" on February 6, 2010 (as at no time did this establishment ever lawfully license the Event from our company for such a purpose). A true and correct copy of the Affidavit of Jim Hollenbeck is attached hereto as exhibit "A-3."

9. It is essential that I communicate to the court that to the best of my knowledge our programming is *not* and cannot be mistakenly, innocently, or accidentally intercepted. Some methods that a signal pirate can unlawfully intercept and broadcast our programming are as follows without limitation:

    A. The use of a "blackbox," "hotbox," or "pancake box" which is purchased for a fee and when installed on a cable TV line will allow for the descrambled reception of a pay-per-view broadcast, or

    B. The use of a "smartcard" or "test card" or "programming card" which is purchased for a fee and when installed on a DSS satellite receiver line will allow for the descrambled reception of a pay-per-view broadcast, or

C. The purposeful misrepresentation of a commercial establishment as a residential property to allow the fraudulent purchase of a pay-per-view (or prohibited) programming at the residential rate, or

D. The use of illegal cable drop or splice from an apartment or home adjacent to the commercial establishment premises (which would purchase the broadcast at a residential price and divert the program to the commercial establishment), and/or

E. The purchase of other illegal unencryption devices, and the purchase of illegal satellite authorization codes which are readily available on the internet, in trade publications, and through "word of mouth."

10. Turning these facts to the matter before the court I have been advised by counsel that the court has wide discretion in the awarding of statutory damages for nefarious, illegal and debilitating activities of signal pirates which are injurious to our company and our lawful customers.

11. It is respectfully submitted to this court that the unchecked activity of signal piracy not only has resulted in our company's loss of several millions of dollars of revenue, but also has a detrimental effect upon lawful residential and commercial customers of cable and satellite broadcasting whose costs of service are increased significantly by these illegal activities, including the depravation of tax revenue to the communities where our potential customers reside, and the denial of benefits such tax revenue would provide the residents of such communities.

12. We, at JOE HAND PROMOTIONS, INC., believe that the persistent signal piracy of our programming costs our company, our customers, and their communities millions of

dollars annually resulting in part, from the perceived lack of consequences (including nominal or minimal damage awards by the courts who hear our cases).

13. For these reasons I ask this court to grant a substantial allowance for statutory damages due to the fact that such actions are *per se* intentional and do not and cannot occur without the willful and intentional modification of electronic equipment, the willful and fraudulent misrepresentation of a commercial establishment as a residential one, the removal of cable traps or devices designed to prevent such unauthorized exhibits, or other willful and/or international acts purposely designed to obtain our programming unlawfully.

14. I am also troubled by the fact that the courts have placed undue weight upon whether the *promotion* of programming by the signal pirates (rather than the *exhibition* of the programming itself) was done willfully and/or for commercial benefit. I would ask the court to recognize that the willful and purposeful acts necessary to intercept and exhibit the programming precede whatever steps are, or are not taken, by the pirate establishment to promote our programming to their customers.

15. I would also ask the court to recognize that the pirates do not generally advertise the fact that they intend to exhibit our programming unlawfully to the public for the practical reason that they wish to avoid the risk of detection. This of course does not preclude the very real possibility that the unlawful exhibition may well have been promoted by word of mouth or advertising that went undetected by the auditors, to their own customers to increase their financial gain on the night our programs are broadcasted at their establishment.

16. In addition, it is extremely unlikely that a pirate establishment would increase the costs of food or drink on the evening they are broadcasting one of our programs unlawfully. In my personal experience gained through many years in the promotion industry, it is most

5

uncommon that even our legal locations would employ such a method to recover some of our sublicense fee back from their own customers. I would point out however that since our auditors do not benchmark the prices charged for food or drink at the pirate locations subsequent to conducting the field surveillance on the evening our programming is broadcast, it is undetermined whether the prices paid by an auditor at a pirate location on fight night are in fact less than or equal to the normal prices charged by the pirate establishments.

17. I believe it is particularly important that the court understand that the overwhelming majority of pirate establishments, like the Defendants, do not, and likely will not, ever charge a cover or door charge to their customers on the evening our programming is exhibited. To do so would defeat the very purpose of pirating our programming in the first place: to lure or retain patrons who seek to be entertained by our programming. If the pirate demanded a cover charge of its patrons then the competitive advantage he or she held over our lawful customers (who regularly impose a cover charge) would dissipate and the pirate's patrons would be faced with a choice of viewing our programming at the pirate establishment or at our lawful customer's locations where the broadcast environment may be much more attractive (i.e., more monitors, bigger monitors, no risk of interference or interception, etc.).

18. Clearly, this establishment with multiple television monitors, and a physical established location, had no justification to steal our programming and exhibit it for its own financial benefit, except to deny our company the commercial license fee to which was rightfully entitled.

**WHEREFORE** I respectfully request that this court grant our request for enhanced statutory damages and our prayer for actual damages, plus our legal costs along with the attorneys' fees counsel has requested, and that such amounts be awarded against the Defendants named in this action and in our favor.

Respectfully submitted,

Dated: 1/26/12

JOE HAND, JR., President
Joe Hand Promotions, Inc.

Sworn to before me on this 26 day of January, 2012

_____
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SUSANNE KELLY, Notary Public
Lower Southampton Twp., Bucks County
My Commission Expires October 9, 2013

7